IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ALBARO A. PIMENTEL,           )        CASE NO. 1:14CV112
                              )
              Plaintiff,      )
                              )
      v.                      )
                              )        MAGISTRATE JUDGE
                              )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL        )
SECURITY ADMINISTRATION,      )
                              )        **MEMORANDUM OPINION & ORDER**
              Defendant.      )


Plaintiff Albaro A. Pimentel ("Pimentel") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to discuss the opinion of consultative examiner Richard Halas regarding Pimentel's moderate limitation in attention and concentration to perform simple, repetitive tasks; failed to adequately explain what weight he gave that portion of the opinion; and assessed an RFC that was inconsistent with that portion of the opinion.  The ALJ also failed to discuss the opinion of state agency reviewer Dr. Mary  Hill with respect to Pimentel's limitations in pace and changes in the work setting; failed to adequately explain what weight he gave that portion of the opinion; and assessed an RFC that contained no pace-based restrictions or work change restrictions.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED**.

1

## I. Procedural History

Pimentel protectively filed an application for DIB on July 14, 2010, and an application for SSI on July 22, 2010, alleging a disability onset date of January 1, 2009.  Tr. 13, 204-207. He alleged disability based on the following: bipolar, "hbp," sinuses, and hearing loss in both ears.  Tr. 247.  After denials by the state agency initially (Tr. 78-79) and on reconsideration (Tr. 107-108), Pimentel requested an administrative hearing.  Tr. 133.  A hearing was held before Administrative Law Judge ("ALJ") C. Howard Prinsloo on June 5, 2012.  Tr. 31-53.  In his August 14, 2012, decision (Tr. 13-24), the ALJ determined that Pimentel was capable of performing his past relevant work in addition to other jobs in the national economy, i.e., he was not disabled.  Tr. 22.  Pimentel requested review of the ALJ's decision by the Appeals Council (Tr. 8) and, on November 21, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Pimentel was born in 1969 and was 40 years old on the date his application was filed.  Tr. 206.  He completed eleventh grade and has a limited ability to communicate in English.  Tr. 37. He last worked in 2007.  Tr. 247.

### B.  Relevant Medical Evidence[1]

Pimentel first complained of mental health issues on February 26, 2010, when he saw Richard Cole, D.O.  Tr. 342.  Pimentel reported personality changes, memory loss and mood swings.  Tr. 342.  On March 19, 2010, Pimentel saw Dr. Cole again and complained of insomnia,

---

[1]  Pimentel only challenges the ALJ's decision with respect to his mental impairments.  Doc. 16, p. 2.

hearing voices, and feeling depressed for the last three months.  Tr. 341.  Dr. Cole prescribed

Seroquel[2] and commented that Pimentel should have a psychiatric evaluation.  Tr. 341.

On March 31, 2010, therapist Felicia Fior-Nossek conducted a psychiatric evaluation.  Tr.

400.  Pimentel complained of having too many problems, constant mood changes, depression

and insomnia.  Tr. 400.  He reported audio hallucinations and seeing "something move."  Tr.

401.  Fior-Nossek observed that Pimentel's appearance was normal and that he was cooperative,

alert, and oriented.  Tr. 402.  His attention, concentration and speech were normal.  Tr. 402.  He

had racing thoughts and was restless, depressed, irritable, anxious and angry.  Tr. 401-402.  His

affect was flat.  Tr. 402.  His memory was abnormal—Fior-Nossek commented that Pimentel did

not remember her name and remembered only one out of three words.  Tr. 402.  Fior-Nossek

diagnosed Pimentel with major depressive disorder and assigned a Global Assessment of

Functioning (GAF) Score of 45.[3]  Tr. 402-403.   She prescribed Depakote.[4]  Tr. 403.

Pimentel continued to receive treatment until March 9, 2012.  Tr. 572, 561-569, 478-480,

400-414.  On April 6, 2010, Pimentel reported that his mood and concentration were a little

better although he still had crying spells.  Tr. 404.  On April 29, 2010, Pimentel stated that he

sometimes felt nervous in the afternoon, had racing thoughts, was a little depressed, and that he

sometimes sees something on the floor that is not there.  Tr. 405.  On May 27, 2010, Pimentel

was sad and depressed and reported mood swings and audio and visual hallucinations.  Tr. 406.

---

[2]  Seroquel is an anti-psychotic medication.  *See* Dorland's Illustrated Medical Dictionary, 32nd  Edition, 2012, at 1566, 1698.

[3]  GAF (Global Assessment of Functioning ) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

[4]  Depakote is used to treat manic episodes.  *See* Dorland's, at 490, 558.

His thoughts were clear and organized.  Tr. 406.  On June 15, 2010, Pimentel felt better.  Tr. 407.

He had mood swings "sometimes" and reported audio and visual hallucinations.  Tr. 407.  On

August 5, 2010, Pimentel stated that he felt angry sometimes but was not depressed.  Tr. 408.

On September 2, 2010, Pimentel's mood and anxiety had improved.  Tr. 409.  He still had

hallucinations and felt hopeless at times.  Tr. 409.  On October 5, 2010, Pimentel was "overall

doing well" with no depression, mood swings, or sadness.  Tr. 410.  He still heard voices.  Tr.

410.  On December 8, 2010, Pimentel reported that he was sometimes sad and depressed and

occasionally had mood swings.  Tr. 411.  He still had hallucinations.  Tr. 411.  During that time,

he was also prescribed Klonopin and Risperdal.[5]  Tr. 412.

On July 25, 2011, Pimentel complained of irritability and being "a little depressed."  Tr.

479.  He had occasional audio and visual hallucinations.  Tr. 479.  On August 23, 2011, Pimentel

reported being "overall better."  Tr. 478.  He denied being sad or depressed. Tr. 478.

On March 9, 2012, Pimentel complained of sadness, anxiety, anger or irritability,

paranoia and hallucinations and rated his current psychiatric status as "poor."  Tr. 563.  He stated

that he had problems with memory and concentration.  Tr. 563.  He reported mood swings and

severe anxiety and depression.  Tr. 564.  On April 26, 2012, Pimentel complained of the same

symptoms as his prior visit.  Tr. 561.  He rated his current psychiatric status as "ok."  Tr. 561.

He stated that he felt better and denied mood swings.  Tr. 562.

## C.  Medical Opinion Evidence

### 1.  Treating Source

On March 20, 2012, Felicia Fior-Nossek, a psychotherapist, completed a medical source

statement form.  Tr. 558-559.  She indicated that Pimentel had extreme limitations in his ability

---

[5]  Klonopin is used to treat panic disorders.  *See* Dorland's, at 373, 989.  Risperdal is an anti-psychotic medication.
*See id.*, at 1650.

to perform work activities at a reasonable pace and to withstand the stresses and pressures of routine, simple, unskilled work.  Tr. 558-559.  She found that Pimentel had marked restrictions in all other areas, including the ability to maintain concentration and attention for two-hour time periods.  Tr. 558.  She stated, "despite treatment continues to have auditory hallucinations, paranoia and anxiety."  Tr. 559.  She diagnosed Plaintiff with schizoaffective disorder.  Tr. 559.

On June 5, 2012, Theofilus Arthur-Mensah, M.D., signed the same form that was completed by Fior-Nossek.  Tr. 571-572.

## 2.  Consultative Examiner

On January 12, 2011, Richard Halas, M.A., a clinical psychologist, conducted a consultative examination.  Tr. 392-395.  Halas described Pimentel as presenting in a neat and well-kept manner.  Tr. 392.  He was cooperative, hesitant, and "extremely vague during the interview and the subsequent mental status examination."  Tr. 393.  Halas commented that Pimentel "tended, if anything, to minimize and/or deny problems."  Tr. 393.

Pimentel's speech pattern was slow and constricted, although the interview took place with an interpreter.  Tr. 393.  Halas found that Pimentel's responses were specific, goal oriented, coherent and relevant. T r. 393.  His eye contact was good.  Tr. 393.  He reported problems sleeping and having crying spells and he was tearful during the examination.  Tr. 393.  He admitted he had feelings of hopelessness, helplessness and worthlessness.  Tr. 393.  Halas noted that Pimentel's psychomotor activity "reflects retardation."  Tr. 393.

Halas observed that Pimentel showed relatively low levels of anxiety.  Tr. 394.  He assessed Pimentel's overall mental content as within normal limits and commented that Pimentel showed no symptoms or characteristics that would be consistent with a thought disorder or psychotic process.  Tr. 394.  He was not delusional or hallucinatory.  Tr. 394.  His overall quality

of consciousness was good and he was reasonably oriented to time, place and person.  Tr. 394.

Halas characterized Pimentel's short term memory as good but noted that he was only able to

recall one of three objects after five minutes.  Tr. 394.  He was able to do simple calculations but

not serial sevens.  Tr. 394.

Pimentel reported that he drives his daughter to school every morning.  Tr. 394.  He and

his wife share household chores.  Tr. 394.  He enjoys going to the park in the summer.  Tr. 394.

He stated that the primary reason he was unable to work competitively was his inability to stand

for long periods of time. Tr. 394.

Halas opined that Pimentel was not impaired in his ability to follow through with simple

instructions and directions and to withstand the stresses and pressures associated with day-to-day

work activities.  Tr. 395.  He found Pimentel moderately impaired in his ability to maintain

attention and concentration to perform simple, repetitive tasks and his ability to relate to others.

Tr. 395.

### 3.  State Agency Reviewers

On January 18, 2011, David Dietz, Ph.D., a state agency psychologist, reviewed

Pimentel's medical record.  Tr. 55-59.  Regarding Pimentel's mental residual functional capacity

("RFC"), Dr. Dietz opined that Pimentel had moderate limitations in his ability to understand,

remember and carry out detailed instructions and to maintain attention and concentration for

extended periods.  Tr. 61-62.  He explained this finding by noting that Pimentel only

remembered one of three items after five minutes, had a flat affect and slow speech.  Tr. 62.  He

opined that Pimentel would be capable of completing a variety of 3-4 step tasks that do not

require more than superficial social interactions.  Tr. 63.

On May 25, 2011, Mary K. Hill, Ph.D., a state agency psychologist, reviewed Pimentel's medical record.  Tr. 81-85.  Dr. Hill's RFC findings were the same as Dr. Dietz's findings but with some added limitations.  Tr. 102-103.  Dr. Hill opined that Pimentel could perform 1-4 step tasks with no multi-tasking and no requirement for completion at a rapid pace.  Tr. 103.  She also opined that Pimentel could perform work in a static environment where change is explained and gradually introduced.  Tr. 104.

### D.  Testimonial Evidence

#### 1.  Pimentel's Testimony

Pimentel was represented by counsel and testified at the administrative hearing.  Tr. 35-50.  He testified that he completed eleventh grade.  Tr. 36.  He has a limited ability to communicate in English.[6]  Tr. 34-36.  He is married and has three children who, at the time of the hearing, were ages 14, 16 and 19.  Tr. 42, 49-50.

The last time Pimentel worked was in 2007.  Tr. 37.  He testified that he previously performed maintenance work and cleaned offices.  Tr. 38.  He also worked in a factory operating heavy machinery and on an assembly line.  Tr. 38-39.  He testified that, in his past jobs, he had trouble keeping up with the pace of the work or that an employer told him that he was too slow.[7]  Tr. 39.

Pimentel stated that he seeks mental health treatment for "bipolar."  Tr. 40.  He testified that he was told he has anxiety.  Tr. 40.  He has anxiety or gets nervous when he has too much stress, such as when his "mind goes very fast" which causes him to become "desperate."  Tr. 41.  He also experiences irritability when he is around people.  Tr. 41.  He sometimes goes to the

---

[6]  An interpreter was utilized at the hearing.  Tr. 33.

[7]  Pimentel answered "yes" to the following two-part question: "did you ever have trouble keeping up [ ] or did an employer ever tell you that you were too slow?"  Tr. 39.

store but his wife goes in the store and he waits in the car.  Tr. 42.  He is not able to watch an

entire movie because he gets nervous and desperate.  Tr. 42.  When he feels this way he goes for

a walk outside. Tr. 42.

Pimentel testified that he hears a voice that calls his name and that he sees something

black going across in front of him.  Tr. 42.  He takes prescribed medication.  Tr. 43.[8]  He had a

drinking problem and his doctors have told him to drink less or stop drinking.  Tr. 45.  He last

drank the night before the hearing when he had two bottles of beer.  Tr. 46.  The last time before

that was "last Thursday."  Tr. 46.

### 2.  Vocational Expert's Testimony

Vocational Expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 50-52.  The

ALJ discussed with the VE Pimentel's past relevant work as an office cleaner and small products

assembler.  Tr. 50-51.  The ALJ asked the VE to determine whether a hypothetical individual of

Pimentel's age, education, and past work experience could perform the jobs he performed in the

past if that person had the following characteristics: can perform medium work but only simple,

routine and repetitive tasks and cannot work at unprotected heights or around dangerous or

moving machinery.  Tr. 51.  The VE testified that the person could perform Pimentel's past

relevant work.  Tr. 51.  The ALJ asked the VE if there are other jobs that the person could

perform, and the VE testified that the person could perform jobs as a laundry laborer (100,000

national jobs, 5,000 Ohio jobs, 600 regional jobs), janitor (200,000 national jobs, 10,000 Ohio

jobs, 800 regional jobs), and food service worker (130,000 national jobs, 5,000 Ohio jobs, 600

regional jobs).  Tr. 51-52.

---

[8]  Pimentel answered "yes" to the two-part question, "do the medications resolve the symptoms that you have, the voices, the shadows, the black thing that you see, the anxiety, the nerves; does the medications resolve all those symptoms, or do you still have symptoms even when you take the medication?"  Tr. 43.

Next, the ALJ asked the VE to determine whether there was any work that the same hypothetical individual could perform if that individual would be unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis.  Tr. 52.  The VE answered that there were no jobs that such an individual could perform. Tr. 52.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to

determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 14, 2012, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.  Tr. 15.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.  Tr. 15.

3.      The claimant has the following severe impairments: alcohol abuse, hearing loss, depressive disorder, and degenerative disc disease of the lumbar spine.  Tr. 15.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 16.

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can do no work with unprotected heights or around dangerous or moving machinery.  He can perform no jobs requiring frequent telephone

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

communication or the ability to read or write in English.  Finally, the
claimant is limited to simple, routine, and repetitive tasks.  Tr.18.

6.       The claimant is capable of performing past relevant work as a
         housekeeping cleaner and a small products assembler.  This work does
         not require the performance of work-related activities precluded by the
         claimant's residual functional capacity.  Tr. 22.

7.       The claimant has not been under a disability, as defined by the Social
         Security Act, from January 1, 2009, through the date of this decision.  Tr.
         24.

## V. Parties' Arguments

Pimentel objects to the ALJ's decision on three grounds.  First, he argues that the ALJ

erred with respect to the opinions of Dr. Arthur-Mensah and Fior-Nossek.  He contends that the

ALJ failed to give controlling weight to the treating source opinion of Dr. Arthur-Mensah; failed

to mention the opinions; failed to distinguish between the two sources; did not give good reasons

for assigning their opinions "little" weight; and that the ALJ's "findings" are inconsistent with

their opinions.  Doc. 16, p.1.  Second, Pimentel submits that the ALJ failed to address Halas'

opinion regarding concentration, persistence or pace and failed to adequately explain why he

"discounted" Halas' opinion regarding social functioning.  Doc. 16, p. 1.  Third, Pimentel asserts

that the ALJ failed to address Dr. Hill's opinion limiting Pimentel in areas of concentration,

persistence, pace, and changes in the workplace and failed to include these limitations in his RFC

assessment.  Doc. 16, p. 1.

In response, the Commissioner contends that substantial evidence supports the ALJ's

RFC assessment and the weight he gave to the medical source opinions.  The Commissioner also

maintains that substantial evidence supports the ALJ's finding that Pimentel retained the capacity

to perform his past relevant work and, alternatively, other jobs existing in the economy.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err when he considered the opinions of Dr. Arthur-Mensah and therapist Fior-Nossek

Pimentel asserts that the ALJ erred because he: (1) mentioned Dr. Arthur-Mensah and therapist Fior-Nossek but failed to note that they are treating sources; (2) did not mention "any of their opinions" or distinguish between the two sources; (3) failed to give good reasons for the "little weight" he gave to their opinions; and (4) made findings that were inconsistent with the opinions of Dr. Arthur-Mensah and Fior-Nossek.  Doc. 16, p. 8.

### 1.  Because Dr. Arthur-Mensah is not a treating source, the ALJ was not required to give his opinion controlling weight.

Pimentel argues that the ALJ "skipped over the required controlling-weight analysis" due Dr. Arthur-Mensah, a treating physician.  Doc. 16, p.11.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). The plaintiff has the burden of showing that a doctor is a treating physician.  *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating source rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

Dr. Arthur-Mensah is a psychiatrist, an acceptable medical source.  *See* 20 CFR § 404.1502.  However, it is not clear from the record that Pimentel ever saw Dr. Arthur-Mensah. Instead, the treatment notes were either penned by therapist Fior-Nossek (Tr. 403, 404) or an undetermined individual (Tr. 411).[10]  Pimentel does not identify evidence in the record showing

---

[10]  Pimentel concedes that Fior-Nossek is a non-accepted medical source and, therefore, not subject to the treating physician rule.  Doc. 16, p. 11, n.1.

13

that Dr. Arthur-Mensah ever treated Pimentel.  Because Pimentel has not shown that Dr. Arthur-Mensah is a treating source, his opinion is not subject to the treating physician rule.[11]  Therefore, the ALJ was not required to give Dr. Arthur-Mensah's opinion controlling weight or explain why he did not give his opinion controlling weight.

### 2. The ALJ explained the basis for giving the opinions of Dr. Arthur-Mensah and Fior-Nossek "little" weight.

Pimentel points out that the opinion of a non-acceptable treating source must still be weighed under the factors found in the regulations.  Doc. 16, p. 9.  He criticizes the ALJ for not giving good reasons for assigning "little" weight to the opinions of Dr. Arthur-Mensah and Fior-Nossek.  Doc. 16, pp. 9-12.  Pimentel also complains that the ALJ did not distinguish between the two sources.  Doc. 16, p. 10.

As discussed, *supra*, the ALJ was not required to give good reasons why he did not give controlling weight to the opinion of non-treating physician Dr. Arthur-Mensah.  Moreover, although Pimentel criticizes the ALJ for failing to distinguish between Dr. Arthur-Mensah and Fior-Nossek, Pimentel likewise does not separate his argument regarding the opinions of these two individuals and only argues that the opinion(s) should be given controlling weight.  *See* Docs. 16, pp. 8-12; 21, pp. 2-8.  The Court notes that it is not surprising that the ALJ considered the opinions together because the opinions consist of a form that was filled out and signed by Fior-Nossek on March 20, 2012, and then later signed by Dr. Arthur-Mensah on June 5, 2012.  Tr. 21, 558-559, 571-572.  The opinions are identical.

Pursuant to 20 CFR § 404.1527(c), the Commissioner weighs medical opinion evidence that is not entitled to controlling weight  based on the following: the examining relationship; the

---

[11]  Even Pimentel refers to the treatment records as "a variety of notes by non-acceptable sources."  Doc. 21, p. 6 (referring to Exhibit 7F).

treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.

Regarding non-acceptable medical sources, Social Security Ruling 06-03p provides,

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources".… Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

Here, with respect to the opinions of Dr. Arthur-Mensah and therapist Fior-Nossek, the ALJ remarked upon the longitudinal treatment relationship but observed that the opinions appeared to be based more on Pimentel's subjective complaints rather than objective observations.  Tr. 21.  Specifically, the ALJ commented that the opinions were inconsistent with "multiple counseling records that span over 2010 and 2011."  Tr. 21.  The ALJ also noted that the opinions provide no evidence discussing the basis for the extreme limitations placed on Pimentel's functional ability.  Tr. 21.

Pimentel contends that the ALJ "does not mention any of [Dr. Arthur-Mensah's and Fior-Nossek's] opinions."  Doc. 16, p. 8.   The Court disagrees.  The ALJ accurately characterized the opinions of Dr. Arthur-Mensah and Fior-Nossek as finding "extreme limitations on [Pimentel's] functional ability."  Tr. 21; 558-559 (opinion finding marked or extreme limitations in all areas of functioning).  Additionally, as the ALJ pointed out, the opinions of Dr. Arthur-Mensah and Fior-Nossek do not include an explanation for why they assessed each functional limitation as marked or extreme, as the medical source form itself requires.  *See* Tr. 558-559 ("Please

comment on any abilities that are markedly or extremely limited."). Instead, Dr. Arthur-Mensah and Fior-Nossek checked boxes for each functional limitation and provided no explanation. When deciding how much weight to give an opinion, an ALJ may take into account whether the opinion consists of checked boxes with no explanations.  *See Rogers v. Comm'r of Soc. Sec.*, 2000 WL 799332, at *6 (6th Cir. June 9, 2000) (ALJ did not err in failing to credit treating source opinions that failed to explain the reasons why certain boxes in the report forms were checked off); *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471-72 (6th Cir. 2014) (ALJ reasonably gave less than controlling weight to the opinions in the form filled out by plaintiff's treating psychiatrist when the form consisted solely of checked boxes with no explanations despite the form requiring explanations).[12]

Next, Pimentel asserts that the ALJ did not cite evidence in support of his finding that the opinions are based more on subjective complaints rather than objective observations.  Doc. 16, p. 11.  Again, the Court disagrees.  The ALJ cited Exhibit 7F and correctly identified that exhibit as multiple counseling records spanning from 2010 to 2011.  Tr. 21.  The counseling records in Exhibit 7F primarily consist of notes recording subjective complaints: "hears wife calling[,] sees something move"; "mood—'a little bit more better'"; "sometimes feels nervous in afternoon"; "woke up at 4am last night mood swings, irritability feels sad depressed affect brighter"; "I feel more better"; "I feel angry sometimes"; "sees shadows sometimes hears wife calling too"; "denies sad, or depressed"; "hears voices—calling his name—once a day"; "sometimes sad and depressed"; "mood—reports a little sad and depressed"; "c/o feeling 'angry at times' [increase] irritable 'anxious'"; "a few voices at night"; "denies A/V hallucinations."  Tr. 402, 404, 405,

---

[12]  Pimentel cites to a letter drafted by Dr. Arthur-Mensah and Fior-Nossek that appears to explain the limitations found in their opinions.  Doc. 16, p. 11 (citing Tr. 573).  The letter was drafted after the ALJ rendered his decision (Tr. 570, 24, 573) and may not be considered here.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (district court cannot consider evidence that was not submitted to the ALJ when the Appeals Council denies review).

406, 407, 408, 410, 411, 412, 414.  Pimentel identifies one page of his initial psychiatric evaluation detailing "clinical findings."  Doc. 16, p. 11 (citing Tr. 402).  The Court notes that the ALJ stated that the opinions were based *more* on subjective complaints and not that they were based exclusively on subjective complaints.  Tr. 21.  This is an accurate statement.  For example, the record does not indicate that any physician or counselor ever witnessed Pimentel having hallucinations; instead, Pimentel reported the hallucinations.  Finally, the ALJ elsewhere in his decision discussed specific evidence describing Pimentel's subjective reports contained in the counseling records in Exhibit 7F.  Tr. 20 (citing 7F at 3, 7, 12, 13, 14, 16, 17 and discussing Pimentel's subjective reports of symptoms).  The ALJ's failure to again cite each separate counseling record in the paragraph discussing opinion evidence is not error.

Pimentel also argues that one of the ALJ's stated reasons—that the opinions of extreme limitations are inconsistent with multiple counseling records—does not contain a citation to specific evidence.  Doc. 16, p. 11.  As noted, *supra*, the ALJ elsewhere in his decision thoroughly considered the counseling records in Exhibit 7F.  Tr. 20.  The ALJ explained that Pimentel steadily reported that his symptoms had improved.  Tr. 20 (citing, *e.g.*, Exhibit 7F at 16 & 17 in which Pimentel reported improvement in symptoms, including hallucinations).

Pimentel accuses the ALJ of "cherry-picking" the evidence because, although the ALJ referred to objective notations in Pimentel's initial assessment in March 2010 that Pimentel had normal grooming, hygiene, speech, concentration and attention span, that record also shows that Pimentel's mood was depressed, anxious, angry and irritable, and he had a flat affect, racing thoughts, hallucinations, and an abnormal memory.  Doc. 21, p. 7; Tr. 20, 401-402.  However, in addition to more positive clinical signs, the ALJ mentioned other, less positive portions of the initial assessment—that Pimentel continued to complain of depression and auditory

17

hallucinations and that he was prescribed Depakote, used to treat manic episodes, "to treat his symptoms." Tr. 20. Furthermore, the ALJ described how, over time, Pimentel's symptoms improved. Tr. 20. Although Pimentel was assessed a GAF score of 45 on his initial assessment, the ALJ remarked that he was assessed a GAF score of 85 in April 2012. Tr. 20. As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (rejecting plaintiff's argument that the ALJ cherry-picked portions of treatment notes that depicted her condition in a positive light and ignoring more troubling aspects).

Finally, Pimentel, in a footnote in apparent conjunction with his above-described arguments regarding the treating physician rule, asserts that the ALJ "also erred by claiming that Pimentel's 'testimony as to his [mental] symptoms cannot be fully accepted as he has been unwilling to heed medical advice [to stop drinking entirely]'." Doc. 16, p. 11. Pimentel states, "This assessment of credibility is improper…" Doc. 16, p. 11, n. 1. Pimentel, however, does not articulate a challenge to the ALJ's credibility assessment as a whole, and the Court, therefore, will not consider the argument as presented. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

In sum, the ALJ's decision was sufficiently detailed so as to permit the Court to follow the ALJ's reasoning and it adequately explained why he gave little weight to the opinions of Dr. Arthur-Mensah and Fior-Nossek. *See* SSR 06-03p, 2006 WL 2329939, * 6; 20 CFR § 404.1527(c).

**B. The ALJ did not describe the weight he gave to Halas' opinion that Pimentel is moderately limited in his ability to maintain attention and**

**concentration to perform simple, repetitive tasks and the ALJ's RFC assessment is inconsistent with Halas' opinion**

Pimentel asserts that the ALJ failed to mention the opinion of consultative examiner Halas that Pimentel is moderately limited in his ability to maintain attention and concentration to perform simple, repetitive tasks.  Doc. 16, p. 14.  He argues that the ALJ's RFC assessment limiting him to simple, routine and repetitive tasks does not adequately provide for the moderate limitations found by Halas.  Doc. 16, p. 14.

With respect to Halas' opinion, the ALJ stated,

> the undersigned has granted weight to the opinion of Richard Halas, MA, the consultative examiner (Ex. 5F).  Mr. Halas' opinion is based on his personal examination of the claimant and is generally consistent with the overall evidence of record.  However, his opinion regarding the claimant's social functioning is given reduced weight as it is not consistent with the totality of the evidence.  Namely, it is inconsistent with the evidence that the claimant [is] able to shop in stores for clothes and go to the supermarket (Ex. 4E).  The claimant also informed the consultative examiner that his favorite activity is to go to the park with his family (Ex. 5F).  Moreover, the objective evidence indicates that the claimant generally acted appropriately during his appointments and he was appropriate for the duration of the hearing. Therefore, the undersigned has granted weight to Mr. Halas' opinion, but has not given it great weight.

Tr. 21.  The ALJ says he gave "reduced weight" to the social functioning part of the opinion.  The Court is unable to ascertain how much weight the ALJ gave the portions of Halas' opinion that did not involve social functioning.[13]  It appears that the ALJ credited Halas' opinion regarding attention and concentration because the ALJ discussed why he gave "reduced weight" to the portion of Halas' opinion regarding social functioning.  Thus, the ALJ gave more than "reduced" weight to the rest of Halas' opinion—namely, that Pimentel has moderate limitations in his ability to maintain attention and concentration to perform simple, repetitive tasks.[14]

---

[13]  In his decision, the ALJ assigned opinions or portions of opinions as follows: "great weight"; "not [ ] great weight"; "weight"; "reduced weight"; and "little weight."  Tr. 21.

[14]  While considering the Paragraph B criteria, the ALJ found Pimentel to have moderate limitations in his ability to maintain concentration, persistence or pace.  Tr. 17.

Despite this, the ALJ's RFC assessment found that Pimentel could perform simple, routine, and repetitive tasks with no additional limitations.  Tr. 18.  The ALJ's RFC assessment is, therefore, inconsistent with Halas' opinion.

Defendant contends that the ALJ, in his step three analysis, discussed Halas' report in support of his finding that Pimentel was moderately limited in his ability to maintain concentration, persistence or pace and that the ALJ's RFC assessment reflected Halas' opinion that Pimentel could follow through with simple instructions and/or directions.  Doc. 18, p. 11. The Court notes that the ability to follow simple instructions or directions is a separate limitation from the ability to maintain attention and concentration to perform simple, repetitive tasks.  *See* Tr. 395.  Moreover, in his step three analysis, the ALJ discussed subjective and objective portions of Halas' report but did not mention Halas' opinion regarding Pimentel's attention and concentration limitations. Thus, the fact that the ALJ discussed subjective and objective portions of Halas' report does not suffice as an explanation for the weight he gave Halas' opinion regarding attention and concentration.

Defendant also submits that the ALJ considered Pimentel's concentration deficits by including additional restrictions in his RFC assessment that Pimentel avoid exposure to unprotected heights and dangerous moving machinery.  Doc. 18, p. 11.  These restrictions, however, were assessed by a state agency reviewer because of Pimentel's hearing loss, not his mental limitations.  *See* Tr. 61.  Moreover, the ALJ did not explain why he included the aforesaid restrictions in his RFC assessment and the Court cannot entertain the Commissioner's *post-hoc* rationalizations.  *See S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge propriety of agency action "solely by the grounds invoked by the agency").

Because the ALJ gave "weight" to Halas' opinion regarding Pimentel's moderate limitations maintaining attention and concentration to perform simple, repetitive tasks but failed to explain how much weight and why his RFC assessment was not consistent with that opinion, the Court is unable to discern how the ALJ's RFC assessment reflects the weight he purportedly gave to Halas' opinion.

### C.  The ALJ adequately described the weight he gave to Halas' opinion regarding Pimentel's social functioning

Pimentel argues that the ALJ provided an "inadequate explanation" as to why he gave "reduced weight" to Halas' opinion that Pimentel has moderate limitations in social functioning. Doc. 16, p. 14.  The ALJ explained that Halas' opinion is inconsistent with other evidence in the record showing that Pimentel is able to shop in stores for clothes and to go to the supermarket. Tr. 21.  The ALJ also commented that Pimentel reported to Halas that he enjoys going to the park with his family.  Tr. 21.  Finally, the ALJ observed that "objective evidence in the record indicates that [Pimentel] generally acted appropriately during his appointments and that he was appropriate for the duration of the hearing."  Tr. 21.

Pimentel appears to contend that the ALJ's reasoning is "inadequate as a matter of law" because the evidence relied on by the ALJ does not suggest that Pimentel could "do any of these activities on a *sustained basis*."  Doc. 16, p. 18 (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013)).  The Court notes that the medical opinion in *Gayheart* was a treating source opinion entitled to controlling weight.  *Id*.  Moreover, Pimentel does not identify evidence in the record that supports his apparent contention that he is unable to perform the aforesaid activities on a sustained basis.  The ALJ adequately described reasons and identified evidence in support of his decision assigning reduced weight to Halas' opinion regarding Pimentel's social functioning.  Thus, his decision on this ground must be affirmed.  *See Jones v.*

21

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

> **D. The ALJ did not describe the weight he gave to Dr. Hill's opinion with respect to limitations in pace and work changes and the ALJ's RFC assessment does not include any such restrictions**

Pimentel asserts that the ALJ failed to explain why he "ignored" the opinion of state agency reviewer Dr. Hill.  Doc. 16, p. 18.  He argues that the ALJ only discussed the portion of Dr. Hill's opinion regarding social functioning and not her opinions regarding other limitations she found Pimentel to have in concentration, persistence or pace; changes in the work setting; and multi-tasking.  Doc. 16, p. 18-19.

Dr. Hill opined that Pimentel "is able to attend to and complete 1-4 step tasks with no multi-tasking and no requirement for completion at a rapid pace."  Tr. 89.  With respect to Dr. Hill's opinion, the ALJ stated,

> the undersigned has given weight to the opinions of Dr. Dietz and Dr. Hill, the State agency psychological consultants (Ex. 1A, 2A, 5A, 6A). Their opinions are based on the evidence of record and heavily rely on the consultative examination, discussed above. Similar to the opinion of Mr. Halas, the undersigned has granted reduced weight to Dr. Dietz's and Dr. Hill's opinion regarding the claimant's social functioning as it is inconsistent with the overall evidence.

Tr. 21.

As stated previously, *supra*, the Court is unable to discern what amount of weight the ALJ gave to the portions of Dr. Hill's opinion that did not relate to social functioning.  The ALJ appears to have given Dr. Hill's opinion the same weight he gave Halas' opinion and for the same reasons.

In his step three determination, the ALJ noted that Pimentel reported that he had an inability to keep up with jobs in the past but that he was able to stay on task while answering questions at the hearing.  Tr. 17.  The ALJ, however, did not discuss Dr. Hill's opinion that

Pimentel could not perform at a rapid pace.  Nor did he discuss Dr. Hill's opinion that Pimentel can work in a static environment where change is explained and gradually introduced. The ALJ's RFC assessment included no pace-based or work change restrictions.[15]  Thus, despite giving Dr. Hill's opinion "weight," the ALJ did not describe how much weight and why he failed to include a pace-based and work change restriction in his RFC assessment.  The Court is unable to discern, therefore, how the ALJ's RFC assessment reflects the weight he purportedly gave to Dr. Hill's opinion.

## VII. Conclusion

For the reasons set forth herein, the decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.


Dated: December 29, 2014

Kathleen B. Burke
United States Magistrate Judge

---

[15]  Regarding Pimentel's argument that the ALJ's RFC assessment should have included a restriction based on Dr. Hill's finding that Pimentel is limited to performing one-to-four step tasks with no multi-tasking, Doc. 16, p. 18-19, this argument is unavailing.  Pimentel does not explain how a limitation to simple, routine and repetitive tasks does not account for a restriction to one-to-four step tasks and no multi-tasking.